# 21-3021

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

Lewis Y. Liu,
                    Plaintiff - Appellant, *Pro Se*
          v.
Democratic National Committee (DNC)
                    Defendant - Appellees.

---

On Appeal from the United States District Court
for the Southern District of New York

---

## Brief of Appellant

Respectfully Submitted:

Lewis Y. Liu
Plaintiff-Appellant *Pro Se*
98 Mott Street, Suite 609
New York, NY  10013
347-237-0192
equalvoteamerica@gmail.com

# TABLE OF CONTENTS

| Index | Section | Page |
|:---:|:---|:---:|
| **I.** | Table of Contents | **2** |
| **II.** | Table of Authorities | **3** |
| **III.** | Constitutional Provisions and Statues Involved | **5** |
| **IV.** | Statement of Subject Matter and Appellate Jurisdiction | **6** |
| **V.** | Statement of the Issues Presented for Review | **8** |
| **VI.** | Statement of Facts | **9** |
| **VII.** | The Arguments | **15** |
| **A.** | Appellant has Suffered an Injury in Fact according to Case 19-3054 | **15** |
| **B.** | Appellant has Established the Traceability to Defendant | **19** |
| **C.** | Appellant Seeks the Same Relief as in *Gray v. Sanders* | **21** |
| **D.** | The Complaint is Ripe for the Court to Review | **24** |
| **E.** | Defendant is a State Actor in This Case as in *Gray v. Sanders* | **26** |
| **F.** | Appellant's Case is within the Court's Subject Matter Jurisdiction | **27** |
| **G.** | Equal Opportunity to Participate is Essential to Equal Voting Rights | **29** |
| **H.** | Defendant's Discriminatory Rule Resembles Segregation | **31** |
| **I.** | The Lessons from the Dred Scott Decision | **33** |
| **J.** | Is America same as George Orwell's *Animal Farm*? | **34** |
| **VIII.** | Conclusion | **35** |
| **IX.** | Certification of Compliance | **36** |

## II. Table of Authorities

**Cases**                                                                                                   **Page**

*Baker v. Carr*, 369 U.S. 186 (1962).................................................................................. *passim*

*Browder v. Gayle*, 142 F. Supp. 707 (1956) ...............................................................32

*Brown v. Board of Education*, 347, U.S. 483 (1954)...........................................30, 32

*Bush v. Gore*, 531 U.S. 98 (2000).................................................................................32

*Department of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) ....................16

*Dred Scott v. Sandford*, 60 U.S. 393 (1857) ............................................................33, 34

*Federal Election Commission v. Akins*, 524 U.S. 11, 24 (1998) ................................16

*Gray v. Sanders*, 372 U.S. 368 (1963) .................................................................. *passim*

*Harper v. Virginia Board of Elections,* 383 U.S. 663 (1966) ....................................20

*Liu v. U.S. Congress*, No. 19-3054 (2nd Cir. Oct. 28, 2020).............................15, 16, 17

*Obergefell v. Hodges,* 576 U.S. 644 (2015) ...............................................................29

*Plessy v. Ferguson*, 163 U.S. 537 (1896) .....................................................29, 32, 34

*Reynolds v. Sims*, 377 U.S. 533 (1964)................................................................. *passim*

*Wesberry v. Sanders,* 376 U.S. 1 (1964)............................................................... *passim*

*United States v. Students Challenging Regulatory Agency Procedures*,

    412 U.S. 669, 686-88 (1973) ...............................................................................17

**Constitutional Provisions**                                          **Page**

U.S. Const. Article I, § 9 Clause 4.............................................................27

U.S. Const. Article IV, § 2......................................................................31

U.S. Const. Amend. I...............................................................................31

U.S. Const. Amend. XIV § 1....................................................................31

U.S. Const. Amend. XIV § 2....................................................................17

**Statutes**                                                            **Page**

28 U.S.C. § 1291 Final Decisions of District Courts ...................................6

28 U.S.C. § 1331 Federal Question ............................................................6

28 U.S.C. § 2403(b) Constitutional Question .............................................6

Voting Rights Act of 1965 Amended on June 29, 1982........................22, 31

**Rules**                                                               **Page**

FRAP 3 (a) ...........................................................................................8

FRAP 4 .................................................................................................8

# III. Constitutional Provisions and Statues Involved

**Constitutional Provisions**

U.S. Const. Article I, § 9 provides in pertinent part:
- *No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another.*

U.S. Const. Article IV § 2 provides in pertinent part:
- *The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.*

U.S. Const. Amend. I. provides in pertinent part:
- *Congress shall make no law ... or abridging the freedom of speech ... or the right of people ... and to petition the Government for a redress of grievances.*

U.S. Const. Amend. XIV. § 1. provides in pertinent part:
- *No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States;*
- *...nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.*

U.S. Const. Amend. XIV. § 2. provides in pertinent part:
- *But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress ... or in any way abridged.*

**Statues**

28 U.S. Code § 1291 provides in pertinent part:
- *The courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States.*

28 U.S. Code § 1331 provides in pertinent part:
- *The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.*

28 U.S. Code § 1361 provides in pertinent part:
- *The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.*

Voting Rights Act of 1965 Amended on June 29, 1982
- *Sec. 2. (b) Effective on and after August 5, 1984, subsection (a) of section 4 of the Voting Rights Act of 1965 is amended ...*
  *(F) such State or political subdivision and all governmental units within its territory—*

*(i) have eliminated voting procedures and methods of election which inhibit or dilute equal access to the electoral process.*

- *Section 2 of the Voting Rights Act of 1965 is amended to read as follows:*
  *(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.*

## IV. Statement of Subject Matter and Appellate Jurisdiction

Plaintiff-Appellant (hereinafter Appellant) is registered democratic voter in the state of New York.

A citizen's equal rights to vote is guaranteed and protected by numerous constitutional provisions, such as Article IV § 2, Amend. I., and Amend. XIV § 2, and the Voting Rights Act 1965. Appellant filed this lawsuit against Defendant on the ground that its rules governing the democratic party presidential primary elections have granted voters in four states the exclusive First-Mover status while condemning Appellant and voters in all other states as second-class citizens, thereby violating Appellant's equal right to vote.

28 U.S.C. § 2403(b) grants the court jurisdiction with respect to a constitutional question involving a state action. 28 U.S.C. § 1331 grants the district courts "original jurisdiction of all civil actions arising under the…laws... of the United States. 28 U.S.C. § 1291 provides that the courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States. Appellant's lawsuit was dismissed by the U.S. District Court, Southern District of New York (hereinafter SDNY). Appellant therefore has filed appeal *Pro Se* with the U.S. Court of Appeals for the Second Circuit (hereinafter USCASC) within 30 days pursuant to the FRAP 3. (a) which establishes that an appeal permitted by law as of right from a district court to a court of appeals may be taken only by filing a notice of appeal with the district court clerk within the time allowed by FRAP 4.

The key dates of the proceeding at the District Court for Southern District of New York (SDNY) are summarized as follows:

1. 01/28/2021, Appellant filed the complaint with the SDNY on the ground that existing primary and caucus election system established and enforced by the Democratic National Committee – which has given four specific states, namely, Iowa, New Hampshire, South Carolina and Nevada (hereafter the "Four States") the exclusive first-mover status while subjecting Appellant and voters in the other 46 states, DC and other territories (hereafter the "Other States") – has violated Appellant's equal right to vote in the primary election process for presidential nomination due to state residence. (DKT21-cv-767 #1).

2. 03/04/2021, Defendants filed Motion to Dismiss. (DKT21-cv-767 #17&18).

3. 03/29/2021, Plaintiffs filed Declaration and Memo of Law in Opposition to Dismiss. (DKT21-cv-767 #21 & 22).

4. 04/15/2021, Defendants filed Response in Support of Motion to Dismiss (DKT21-cv-767 #23).

5. 11/12/2021, Judge Lewis J. Liman granted Defendant's motion to dismiss citing lack of subject matter and ordered the Complaint to be dismissed with prejudice. (DKT21-cv-767 #26 & 27)

6. 11/15/2021, Judge Lewis J. Liman issued Amended Opinion and Order that the Complaint is dismissed without prejudice. (DKT21-cv-76729 #28 & 29)

7. 12/09/2021, Appellant filed the Notice of Appeal at the SDNY. (DKT21-cv-76731 #30, 31)

8. 12/13/2021, US Court of Appeals for the Second Circuit issued Docketing Notice which assigned Appellant's case to Docket#21-cv-3021.

9. 01/12/2022, US Court of Appeals for the Second Circuit issued the Notice of Expedited Appeal that Appellant's brief is due no later than February 16, 2022.

## V. Statement of the Issues Presented for Review

Following the FRAP 3(a) and FRAP 4, Appellant *Pro Se* respectfully presents the following key issues for the Court of Appeals to review:

1.   Whether Appellant has standing to sue?

2.   Whether Appellant's Complaint present a constitutionally ripe controversy?

3.   Whether Defendant is a state actor in this case?

4.   Whether Appellant's case is within the Court's subject matter jurisdiction?

## VI. Statement of Facts

In the interest of easy reference, the facts presented in the Plaintiff/Appellant's Complaint and Opposition are presented again as follows (hereafter "SoF"). The primarily sources include Wikipedia and a 22-page Brookings Institute report "Choosing Presidential Candidates" released in July 2016 by Steven Smith and Melanie Springer.

### The History

1. Before 1972, delegates to the national party conventions were selected through a wide variety of mechanisms. The impetus for the national adoption of the binding primary election was the chaotic 1968 Democratic National Convention. Vice President Hubert Humphrey secured the presidential nomination despite not winning a single primary under his own name.

2. After 1968, a DNC-commissioned panel led by Senator George McGovern recommended that states adopt new rules to assure wider participation. A large number of states, faced with the need to conform to more detailed rules for the selection of national delegates, chose a presidential primary as an easier way to come into compliance with the new national Democratic Party rules. The result was that many more future delegates would be selected by a state presidential primary. The Republicans also adopted many more state presidential primaries. By 1992, Democrats had primaries in 40 states and Republicans in 39.

3. New Hampshire held the first primary starting in the 1920s. Iowa has held the first caucus since 1972 because Iowa said it would need a long time to process the results. Both Iowa and New Hampshire have passed a state law that they must hold the first contest.

4. Beginning in the late 1980s, attention in both parties shifted to the timing of the early caucuses and primaries. "Front-loading"—more states moving their caucuses and primaries earlier in

the calendar—and the special place granted to the Iowa caucus and New Hampshire primary were the dominant concerns. By the 1980s, it was obvious that early events received far more candidate and media attention and caused many candidates to drop out once their popularity and fundraising ability proved inadequate to continue. Increasingly, with more states moving their events forward on the calendar and the outcome known earlier in the process, party leaders and voters in states with later events felt disenfranchised.

5. With the broadened use of the primary system, states have tried to increase their influence in the nomination process. One tactic has been to create geographic blocs to encourage candidates to spend more time in a region. Vermont and Massachusetts attempted to stage a joint New England primary on the first Tuesday of March, but New Hampshire refused to participate so it could retain its traditional place as the first primary. The first regional primary was the Southern Super Tuesday of March 8, 1988, in which nine states united in the idea that a candidate would reflect regional interests. It failed as all but two of the eight major candidates won at least one primary on that day.

6. Before the 2008 nomination season began, the Democrats adopted a rule that banned caucuses or primaries before February 5, 2008, exempting Iowa, New Hampshire, Nevada and South Carolina (hereafter "the Four States") to create some additional diversity in the early contests. The new rule also created an automatic penalty -- a loss of 50 percent of a state's delegates -- for violating the timing rule and permitted the DNC to increase the penalty.

7. In 2008, the state legislatures in Michigan and Florida scheduled their states' party primaries before February 5 in violation of the rule. The DNC penalized both states with the loss of all of their delegates, but when the penalty was appealed to the party's Rules and Bylaws Committee it was reduced to a loss of 50 percent of the votes.

8. Both parties enacted stricter timing rules for 2016: primaries and caucuses cannot start until February 1; only the Four States are entitled to February contests.

<u>The 2020 Presidential Primaries</u>

9. In September 2019, New York State legislature passed a law that designated April 28, 2020 as the state's presidential primary date, joining other states' contests on the same day.

10. The 2020 Democratic Party presidential primaries and caucuses took place in all 50 states, the District of Columbia, five U.S. territories and Democrats Abroad organized by the DNC between February 3 and August 11 to select the 3,979 pledged delegates to the 2020 Democratic National Convention held on August 17–20 to determine the party's nominee for president of the United States in the 59th U.S. presidential election. Here's the schedule for the earliest significant primary and caucus contests:

   1) Monday, Feb. 3 — Iowa caucuses (49 delegates).

   2) Tuesday, Feb. 11 — New Hampshire primaries (33 delegates).

   3) Saturday, Feb. 22 — Nevada Democratic caucuses (48 delegates).

   4) Saturday, Feb. 29 — South Carolina Democratic primaries (63 delegates).

   5) Super Tuesday, March 3 — Alabama primaries (59 delegates), Arkansas primaries (36 delegates), California primaries (495 primaries), Colorado primaries (80 delegates), Maine primaries (32 delegates), Massachusetts primaries (114 delegates), Minnesota primaries (91 delegates), North Carolina primaries (122 delegates), Oklahoma primaries (42 delegates), Tennessee primaries (73 delegates), Texas primaries (262 delegates), Utah primaries (35 delegates), Vermont primaries (23 delegates), Virginia Democratic primary (124 delegates).

6)  Tuesday, March 10 — Idaho primaries (25 delegates), Michigan primaries (147 delegates), Mississippi primaries (41 delegates), Missouri primaries (178), North Dakota caucuses (18 delegates), Washington primaries (107 delegates).

7)  Tuesday, March 17 — Arizona Democratic primary (78 delegates), Florida primaries (248 delegates), Illinois primaries (184 delegates), Ohio primaries (153 delegates).

8)  The final primaries take place in June. The Democratic National Convention was slated for July 13-16 in Milwaukee.

11. On April 8, Biden became the presumptive nominee after Sanders, the only other candidate remaining, withdrew from the race. In early June, Biden passed the threshold of 1,991 delegates to win the nomination.

12. On April 27, New York cancelled its primary because there was only one candidate left with an active campaign. One the same day, the Democratic Commissioners at the New York State Board of Elections removed all candidates that had ended or suspended their campaigns for president from the ballot pursuant to NYS Election Law 2-122(a), arguing that only one candidate remained in the race so no primary needed to be held. The commissioners cited the COVID-19 pandemic and millions of dollars in expenses.

13. On April 28, Andrew Yang sued the New York State Board of Elections over this decision, saying that it "creates a dangerous precedent". On May 5, a federal judge ruled that the primary election must proceed with the candidates and delegates who were on the ballot as of April 26 while the primary will be held on June 23, 2020. The State appealed the decision to the 2nd Circuit Court of Appeals,  but lost the appeal on May 19. New York's primary was forced to change from April 28 to June 23, 2020 even though Biden became the presumptive nominee on April 8 and passed the threshold of 1,991 in early June.

14. Based on the 2020 Census data, with more than 90% of its population being white, Iowa and New Hampshire simply don't reflect the diversity of either our country or the Democratic Party, and the Four States represents less than 4% of the national population.

The Political and Economic Impact

15. Since 1972, the Iowa caucuses have had a 43% success rate at predicting which Democrat, and a 50% success rate at predicting which Republican will go on to win the respective party nomination for president at that party's national convention. According to an NPR report dated 01/31/2016, in the last 40 years, just one person has gone on to win the presidency after losing both IA & NH -- Bill Clinton. In fact, since 1976, six eventual nominees have won Iowa, while New Hampshire has picked five nominees over that same time.

16. In an NPR report on 01/29/2016 "*Why Does Iowa Vote First, Anyway*?" Kathy O'Bradovich, a *Des Moines Register* columnist admitted that "The really important thing to remember about Iowa is not that it's first because it's important. Iowa is important because it's first."

17. According to the 2017 Census estimate, IA & NH combined accounted for only 1.40% (0.97% and 0.41% respectively) of the national population but raided 62% of total political spending during the presidential nomination process.

18. Research by Brian Knight, a Brown University economist, published in *The Journal of Political Economy* dated 06/10/2011, shows Voters in states with early primary races such as Iowa and New Hampshire have up to five times the influence of voters in later states in selecting presidential candidates.

19. The National Constitution Center's report on 01/29/2016, "*Why Iowa and New Hampshire go first*" explained that the Iowa caucus and the New Hampshire primary are seen as crucial,

potentially game-changing events in the presidential nominating process precisely because they went first.

20. The Washington Post reported on 04/14/2017 "*Somebody just put a price tag on the 2016 election. It's a doozy.*" The 2016 Presidential Election cost $2.40 billion including $1.23 billion in primaries. That means $765 million (62% of $1.23 billion) was spent in Iowa and New Hampshire, averaging $170 per resident, compared to $469 million (38%) on the other 48 states and D.C., averaging $1.44 per resident.

21. According to https://www.openprimaries.org/taxpayer_costs_of_closed_primaries, during the 2012 presidential nomination process, the cost of running primaries in closed primary states was $287.8 million, average $12.5 million/state; the total cost of running primaries, either closed or open, in all 50 states was $427.3 million, average $10.8 million/state. The five most expensive state primaries were: California $96.0 million, Maryland $27.9 million, Illinois $27.2 million, New York $25.0 million, and Pennsylvania $20.0 million. However, many states have often found the nominee was already decided well before they held contests wasting enormous effort, time, and taxpayers' money.

22. The Washington Post reported on 11/21/2018 "*How much is it worth to Iowa and New Hampshire to go first in presidential years?*" Based on the Federal Election Commission data for the past 13 years, during the period from April of the year before to March of the presidential year, Iowa harvested 34% of the total political spending, New Hampshire reaped 28%, D.C. took a distant 16%, while the other 48 states shared the meager leftover of 18%.

23. NPR reported on 01/23/2021 that the DNC hopes to have the calendar issues resolved before the summer of 2022, when possible 2024 candidates will begin planning their campaigns.

# VII. The Arguments

24. The District Court concluded that (1) Plaintiff does not have standing, and (2) the case does not present a constitutionally ripe controversy, hence the Amended Order (DKT21-cv-767 #28, 29) granted Defendant's motion to dismiss and dismissed the Complaint without prejudice.

25. Appellant understands that in order to invoke federal judicial power, plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. Respectfully, Appellant would like to request the Court of Appeals to review and reconsider the District Court's order with reference to the Court of Appeals' decision in Case No. 19-3054, *Liu v. Congress* (2nd Cir. Oct. 28, 2020, hereafter, Case 19-3054). The Plaintiff/Appellant in Case 19-3054 is the same Plaintiff/Appellant in the current Case 21-3021.

26. Before presenting the rebuttal arguments, Appellant would also like to note that (1) the District Court stated, "*For purposes of this motion, the Court accepts as true the allegations of Liu's Complaint.*" (21-cv-767 Dkt #22 Page 1), and (2) Defendant did not dispute any of the facts presented by Appellant's Complaint.

## A. Appellant has Suffered an Injury in Fact based on Case 19-3054.

27. In Case 19-3054, Plaintiff/Appellant demonstrated that based on the 2010 Census the existing congressional apportionment scheme resulted in underrepresentation because, while Wyomingites receive representation in the House of Representatives at a proportion of one representative per 563,626 persons, with 27 house seats New Yorkers receive representation at a proportion of one representative per 717,707 persons. This means, in the House of

Representatives, one New Yorker's vote was worth only 78.5% of one Wyomingite's vote. In another word, in the past 10 years 21.5% of New Yorkers had been taxed without representation in the House of Representatives. Nationwide, 63,041,190 or 19.1% of Americans in the other 48 states and DC had been taxed without representation.

28. Worse still, after the 2020 Census, with 26 house seats New Yorkers receive representation at a proportion of representative per 776,971 persons, while Wyomingites receive representation at a proportion of one representative per 576,851 persons. This means, in the House of Representatives, one New Yorker's vote was worth only 74.2% of one Wyomingite's vote. In another word, 25.8% of New Yorkers in the next 10 years will be taxed without representation in the House of Representatives. Other than Wyoming, Rhode Island, and Montana, 79,965,582 or 24.1% of Americans in the other 47 states and DC will be taxed without representation in the next ten years. This is not only unconstitutional but also utterly un-American considering the root cause for the American Revolution.

29. In Case 19-3054, the Court of Appeals overruled the District Court's opinion and emphatically affirmed that Plaintiff/Appellant suffered an injury in fact (Dkt 19-3054, #80, Page 7 to 9):

> *In this case, Liu's complaint alleges that New York and forty-seven other states—those states aside from Wyoming and Rhode Island—are unconstitutionally deprived of additional representatives that the states would receive under a proper apportionment scheme. Accordingly, his complaint in part alleges that he and his fellow New Yorkers suffer vote dilution because they must vote in electoral districts with populations larger than they constitutionally should. <u>That is the same injury alleged</u> in Department of Commerce v. U.S. House of Representatives, which <u>the Supreme Court said is an injury in fact under Article III.</u>*

> *[The defendants] They suggest that Liu's asserted injury is an abstract, generally available grievance unsuitable for resolution in a federal court. <u>We disagree.</u> In this case, we are concerned with a right—the right to have one's vote count equally—that the Supreme Court has characterized as concrete, "individual[,] and personal in nature." Reynolds, 377 U.S. at 561. The Court has explained that, <u>"[w]here a harm is concrete, though widely shared," that harm is cognizable under Article III.</u> Federal Election Commission v. Akins, 524 U.S. 11, 24 (1998).*

*Because the Supreme Court's cases have consistently held vote dilution to be an injury in fact, we conclude that Liu plausibly alleged the first element of standing.*

30. Appellant is grateful for the above ruling by the Court of Appeals, and would like to quote

    *United States v. Students Challenging Regulatory Agency Procedures* (1973):

    *To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody.*

31. In Case 19-3054, Plaintiff demonstrated injury in fact based on the indisputable fact that the value of his vote in election for the House of Representatives has been forced to be worth less than another American in Wyoming. Similarly in the current case, Appellant has demonstrated the value of his vote in the primary elections for presidential nomination has been made worth less than those voters in the Four States because of Defendant's discriminatory rule.

32. U.S. Const. Amend. XIV. § 2. mandated that the right to vote in any election for the choice of electors for President shall not be abridged in any way. One voter's vote may be abridged in numerous ways, such as forcing voters into voting districts with significantly unequal population, subjecting voters in different communities to significantly unequal wait time to cast ballot, causing millions of voters on the general election day to struggle between working and voting while retirees have the whole day to vote, or in the present case, denying voters the equal opportunity to participate in the same electoral process.

33. In the current case, Appellant presented numerous indisputable facts (SoF ¶¶ 15-22) that the Four States holding early elections in the primary process have received far more attention and spending from candidates and the news media. Moreover, the value of votes in the Four States have been disproportionately inflated while the value of votes in all Other States has been devalued even demeaned to zero. Both Iowa and New Hampshire have done everything they

can to hold on their first-mover status because they have enjoyed not only the outsized political influence but also the huge economic benefits from being the First-Movers.

34. Let's imagine there are 51 students in a boarding school, two students, IA and NH, insist they must always be the first to go for the all-you-can-eat lunch buffet. Such "me-always-first" claim of course is wrong and will not be accepted by the other students. However, here comes the headmaster who announces these rules: (1) four specific students IA, NH, SC and NV will always be the first to have the all-you-can-eat buffet lunch, (2) the other 46 students cannot go until those four students finish, and (3) anyone who dares to go ahead of those four will be punished with loss of lunch. As a result, the first Four students will always enjoy the full buffet, while the other 46 students will have to fight among themselves, and many of them will find little or nothing left when they arrive at the buffet table.

35. Of course, in reality neither any student can insist "I always go first", nor any headmaster dares to establish such a rule because he/she would be immediately fired and/or sued in the court by the 46 students. Nevertheless, Defendant has committed exactly the same type of discriminatory practice in the current case as the headmaster in the hypothetical example. If the Court would rule against the headmaster, the Court should rule against Defendant too.

36. What Defendant has done is separating voters in two classes, giving the voters in the Four States the exclusive preferential treatment with outsized political influence and huge economic benefits while demeaning the overwhelming majority of voters in the Other States as second-class citizens. This is a direct violation of Equal Protection Clause as the Supreme Court ardently declared in *Gary v. Sanders*, *"The concept 'we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic publications."*

**B. Appellant has Established the Traceability to Defendant**

37. Appellant presented indisputable facts (SoF ¶¶ 1-8) that it is Defendant who has set the rules giving the Four States the exclusive first-mover status while forcing the Other States to scramble among themselves. Furthermore, in 2008 Michigan and Florida were penalized by Defendant for holding primaries before February 5 in violation of the DNC rule. Mindful of the punishment imposed by Defendant upon Michigan and Florida, New York State and the Other States know they cannot hold primaries ahead of the Four States.

38. Appellant presented indisputable facts (SoF ¶¶ 9 - 13) that (1) New York State chose April 28, 2020 to hold primary together with other states in order to comply with Defendant's rule, (2) on April 8, 2020, Biden became the de-facto nominee after all other candidates had dropped out of the race, therefore (3) Appellant's vote was rendered meaningless, and (4) New York State wanted to cancel the primary, but was forced by the court to hold the primary on June 23, 2020 even though Biden already passed the threshold of 1,991 votes in early June. As a result, all New Yorkers including Appellant not only ended up with a ballot not worth the paper it was printed on, but also were forced to pay at least 25 million (SoF ¶¶ 21) for the primary that had become completely meaningless. Such a huge waste of New Yorkers' public funds compared to the $765 million political spending in Iowa and New Hampshire (SoF ¶¶ 20).

39. Just like those 46 students in the aforementioned example who would find little or no food left on the buffet table, by the time Appellant went to the polling station on June 23, 2020, there was only one candidate in the race, and the final outcome had been pre-determined, rendering Appellant's vote meaningless. The root cause that Appellant's vote in the primary process has been abridged significantly compared to voters in the Four States is directly traceable to Defendant's discriminatory rule and its enforcement.

40. Back to the aforementioned Boarding School example, the Headmaster has the power to shut down the lunch cafeteria, and if he/she chooses to do so, no student would have any legal ground to sue because there would be no preferential treatment of four students at the expense of the other 46 students. By the same logic, if Defendant decides no longer to organize any primary contest, and simply let some party elders to choose the party nominee behind closed door of a smoke-filled room like the old days, Appellant would similarly have no legal ground to assert any voting right violation because voters in all states including the Four States would be treated equally with every voter having the same -- zero -- opportunity to participate. However, since Defendant decided to organize the presidential primaries across the country, every voter in every state shall be guaranteed equal opportunity to participate in the same national electoral process.

41. In *Harper v. Virginia Board of Elections* 383 U.S. 663 (1966), Justice Douglas unequivocally affirmed that once the right to vote is granted, the rules must be consistent with the Equal Protection Clause, and classifications which might invade or restrain fundamental rights must be closely scrutinized and carefully confined.

*Once the franchise grated to the electorate, lines may not be drawn which are inconsistent with equal protection.*

*Likewise, the Equal Protection Clause is not shackled to the political theory of a particular era. In determining what lines are unconstitutionally discriminatory, we have never been confined to historic notions of equality, any more than we have restricted due process to a fixed catalogue of what was at a given time deemed to be the limits of fundamental rights.*

*Notions of what constitutes equal treatment for purpose of equal protection do change. [Compare Plessy with Brown.] Our conclusion is founded not on what we think governmental policy should, but what equal protection requires. we have long been mindful that where fundamental rights and liberties are asserted under equal protection, classifications which might invade or restrain them must be closely scrutinized and carefully confined.*

42. Let's consider from a different angle. Voters in the Four States have never suffered such double injuries -- votes diluted or meaningless and taxpayers' money wasted -- experienced by Appellant and voters in the Other States. Furthermore, voters in the Four States will never suffer such injuries if the status quo is allowed to continue. Such injustice is directly caused by none other than Defendant's discriminatory rules. Defendant claimed that it was New York State legislature that chose April 28 as its primary date, hence it was not Defendant's fault. Such blaming-the-victim argument is rather disingenuous.

**C. Appellant Has Sought the Same Relief as in *Gray v. Sanders***

43. Appellant presented the Supreme Court's four precedents (21-cv-767 Dkt #22 Page 5 - 7 ¶¶ 1), namely *Baker v. Carr*, 369 U.S. 186 (1962), *Gray v. Sanders*, 372 U.S. 368 (1963), *Reynolds v. Sims*, 377 U.S. 533 (1964), *Wesberry v. Sanders*, 376 U.S. (1964). In these four cases, the Supreme Court consistently ruled that

   a. the plaintiffs' voting right was violated when their votes were impaired and diluted because of where they live,

   b. the plaintiffs had the standing to sue under the Equal Protection Clause, and

   c. the Court had jurisdiction and duty to review.

44. Among these four cases*, Gray v. Sanders* is the most relevant to the present case, hence shall provide guidance. In fact, this was the first case in which the Supreme Court established "One Person One Vote" as a constitutional principle. Comparisons between *Gray v. Sanders* and our case are outlined below.

   a. <u>The Plaintiff</u>: in *Gray v. Sanders,* Mr. Sanders was an eligible voter in primary and general elections in Fulton county, Georgia; in the present case, Appellant is an eligible voter in primary and general elections in New York.

b. <u>The Defendants</u>: in *Gray v. Sanders*, the Georgia Secretary of State and James H. Gray, the chair of the State Executive Committee of the Democratic Party, were named defendants because they made the rule governing the state primaries; in the present case, the DNC is named Defendant because the DNC has imposed the rule governing the presidential primaries process.

c. <u>The Complaint</u>: in *Gray v. Sanders*, Mr. Sanders sued the Democratic Party for using the county unit system which gave unequal voting power to smaller counties, hence violating the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment and the Seventeenth Amendment; in the present case, Appellant sues the DNC for imposing rules that have given the Four States exclusive First-Mover status and hugely inflated voting power in the presidential primaries, hence violating the Equal Protection Clause, other constitutional provisions and the Voting Rights Act of 1965 as amended in 1982.

d. <u>The Relief</u>: in *Gray v. Sanders*, Mr. Sanders sued in a federal district court to seek a declaratory judgement and an injunction to restrain the defendants from using the county unit system; following the precedent in *Gray v. Sanders*, Appellant in this case respectfully seeks the same relief from the Court (1) a declaratory judgment to hold Defendant accountable for its past violation of Appellant's equal voting right, and (2) an injunction to retrain Defendant from continuing such violation in the future presidential primaries.

45. More specifically, in *Gray v. Sanders*, the District Court held that:

*(1) as a result of the Supreme Court's decision in Baker v. Carr, it had jurisdiction over the complaint; (2) a justiciable case was presented; (3) Sanders, the plaintiff, had standing; (4) the county-unit primary system violated the Equal Protection Clause, and (5) it issued an injunction.*

Subsequently by a vote of 8-1, the Supreme Court agreed and held that:

*(1) <u>the plaintiff</u> like any person whose right to vote is impaired, <u>had standing to sue</u>;*

*(2) the <u>Democratic primary in Georgia was "state" action</u> within the meaning of the Fourteenth Amendment";*
*(3) the case was not moot;*
*(4) the conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments could mean only one thing – "One Person, One Vote";*
*(5) while <u>we agreed with the District Court on most phases of the case and it was right in enjoining the use of the county unit system in tabulating the votes</u>, we vacate its judgment and remand the case so that a decree in conformity with our opinion may be entered.*

46. Within sports, every governing body sets rules to preserve fairness to all teams and athletics. For example, in the FIFA World Cup, 32 teams are randomly drawn into eight groups during the group stage, no team has ever been given any preferential treatment. By the same principle of basic fairness, Appellant would have no complaint if Defendant's rules in future presidential primaries treat all voters of all states equally across the country regardless of state residence. This means in a sequential electoral process, the method by which the order of all 50 states, DC and territories is determined must be transparent, fair and equitable to votes in all states. In another word, voters in every state shall have the equal opportunity to go first or go later without any preferential treatment, no state should be given exclusive first-mover front-seat status, and no state should be permanently condemned to the second-class backseat.

47. Here is one possible solution for Defendant to consider: (1) 50 states are divided into 5 regions, 10 in each region; (2) 15 states (3 from each region by random draw) will hold the first super primary on the last Sunday in March; (3) the remaining 35 states will hold the second super primary on the first Sunday in July; (4) DC and other territories will flip a coin, head joins the first round, tail the second round. This rule will ensure (1) every state has an equal chance to go first or second, (2) unlikely any candidate gets more than half of delegates in the first round, hence voters' votes in the second round will not be rendered meaningless. Therefore, voters of all states will have equal opportunity to participate in the same presidential primary election.

**D. The Complaint is Ripe for the Court to Review**

48. Appellant presented rebuttal (21-cv-767 Dkt #22 Page 7-8 ¶¶ 1-7) to Defendant's argument that this case not ripe for the Court to review. It is rather disingenuous for Defendant to claim Appellant's complaint was based on "guesswork" and "hypothetical controversy." According to Merriam-Webster, the definition of "guess" is to form an opinion from little or no evidence. However, Appellant presented numerous facts to support his Complaint.



49. Defendant blatantly disregarded the historical facts (SoF ¶¶ 1 to 8) that since 1972, Iowa and New Hampshire have always held the first two contests in the Democratic primaries, and since 2008 Defendant has adopted a rule that gave the "Four States" the exclusive First-Mover advantage over the "Other States". For a discriminatory election system that has been in existence for almost half-century, if this is not ripe, nothing is.

50. Appellant respectfully disagrees with the District Court's opinion (21-cv-767 Dkt #29 Page 6):

*As the DNC points out, the selection of now-President Biden as the Democratic nominee was "attributable not to the First Four," Dkt. No. 18 at 4 n.4, but to the later contests; and President Biden "became the presumptive nominee" on April 8, 2020, not because he had won enough pledged delegated to secure the nomination but because that was the day that Vermont Senator Bernie Sanders, "the only other candidate remaining, withdrew from the race," id. at 4 (quoting Compl. at 8).*

51. Appellant's Complaint has always focused on the unequal treatment in the primary process enforced by Defendant, rather than any candidate. Defendant's argument that selection of

Biden as the nominee was "attributable not to the First Four" is a typical example of issue-conflating. The indisputable fact remained that the voters in the Four States always first went to the polls, hence they always had more candidates to choose, always had hugely inflated voting power and dispositional economic benefits; in contrast, Appellant and voters in the Other States always went to the polls later, always had fewer candidates to choose, always had much less or no influence in the same election process. The root cause for such unequal treatment of voters has always been the discriminatory rule imposed by Defendant.

52. According to NPR's report on Jan. 23, 2021, Defendant hopes to have the calendar issues resolved before the summer of 2022, when possible 2024 candidates will begin planning their campaigns. Had Appellant not sued Defendant in 2021 and waited until when Defendant announces its rule for the next presidential primaries, because of the lengthy court proceeding, by the time Appellant files the complaint, Defendant could argue (1) it is too late to make any change and (2) the states have already prepared their primaries according to the announced rule. Hence Defendant will always argue Appellant's complaint either not ripe or moot.

53. Appellant respectfully disagrees with the District Court's opinion (21-cv-767 Dkt #29 Page 6), "*Liu's Complaint rests upon speculation about the DNC's future actions.*" The word "speculation" here means without evidence. Appellant's Complaint was based on the historical facts presented in (SoF ¶¶ 1 to 8, 9-14) which clearly demonstrated Appellant's equal right to vote in the presidential primary election has been diminished or even rendered meaningless.

54. Appellant respectfully disagrees with the District Court's opinion (21-cv-767 Dkt #29 Page 7) that claimed, "*Liu also has not alleged a constitutionally ripe dispute. He does not allege that the DNC has engaged even 'in preliminary discussions' regarding the rule to be adopted.*"

The simple fact is that the debate about Defendant's discriminatory rule has gone on for decades. As Michael Tomasky wrote in the New York Times on Feb. 2, 2020:

*Iowa and New Hampshire. Here they come again, reliably in grim tandem, like the flu and gastroenteritis. Two small, unrepresentative states will set the terms of the Democratic presidential campaign, exerting far more influence over the nominating process than states that rank 32nd and 42nd in population have any right to.*

*This must end for Democrats. Everyone knows it. Everyone argues it. But then, everyone throws up their hands. Iowa has been first for nearly 50 years now, a position to which the Democratic Party has given its tacit assent. And New Hampshire — why, New Hampshire has a law stating that it must be the first primary. So there.*

55. In fact, nothing has compelled Defendant to change its discriminatory rules. As long as Defendant is allowed to maintain the status-quo, Appellant's equal right to vote in the presidential primary election will be again diminished or even rendered meaningless. It is long overdue to stop Defendant's discriminatory rules. And since "discussion and debate" has not worked at all, Appellant has been compelled to file this lawsuit to defend his equal voting right and seek justice and relief in the court of law.


**E. Defendant is a State Actor in This Case.**

56. Defendant claimed it is not a state actor, but such assertion has been refuted by *Gray v. Sanders*, in which the Supreme Court "*agree with the District Court that the action of this party in the conduct of its primary constitutes state action within the meaning of the Fourteenth Amendment*".

57. In the present case, Defendant has established rules for the presidential primaries that involve eligible voters across all 50 states and DC in choosing a nominee for the country's highest office, and the most powerful one in the world. By common sense and *Gray v. Sanders*,

Defendant undoubtedly has engaged in a state action in the present case, hence must be subject to all relevant constitutional provisions and federal statues on voting rights.

58. Consider this scenario, IA and NH pass a law that their residents will always be the first to board any domestic flights, and the United Airlines establishes rules to enforce the two states' laws nationwide. Under such scenario, the United Airlines would have conspired with the two states against passengers of all other states. Sounds familiar?

59. In the present case, both Iowa and New Hampshire passed state laws insisting in holding the first contests in the presidential nomination process. These two state laws would have been completely futile, but by imposing its discriminatory rules, Defendant has conspired with IA and NH against all Other States. Because the presidential election has become deeply money-driven Interstate Commerce drawing hundreds of million dollars in political spending through various commercial activities, the combination of these two state laws and Defendant's discriminatory rules therefore has also violated Article I, § 9, the No Preference Clause.

## F.  Appellant's Case is within the Court's Subject Matter Jurisdiction

60. In *Gray v. Sanders*, both the District Court and the Supreme Court held that the court had jurisdiction, and it issued an injunction because separation of voters in the same election into different classes was a violation of the 14th Amendment's guarantee of equal protection:

> *The District Court held that, as a result of Baker v. Carr, it had jurisdiction, that <u>a justiciable case was stated</u>, that <u>appellee had standing</u>, and that the Democratic primary in Georgia is <u>"state" action</u> within the meaning of the Fourteenth Amendment.*

61. In *Baker v. Carr*, Justice Brennan wrote for the Court that the district court's dismissal was wrong, and debasement of votes was within the Court's jurisdiction.

> *[T]hese plaintiffs and others similarly situated, are denied the equal protection of the laws accorded them by the Fourteenth Amendment to the Constitution of the United States by virtue of the debasement of their votes...<u>We noted probable jurisdiction</u> of the appeal. We hold that*

*the dismissal was error and remand the cause to the District Court for trial and further proceedings consistent with this opinion.*

62. In *Reynolds v. Sims*, Chief Justice Earl Warren wrote for the Supreme Court that voting is a fundamental matter, and dilution of the strength of a citizen's vote "must be carefully and meticulously scrutinized."

> *Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized. Almost a century ago, in Yick Wo v. Hopkins, 118 U. S. 356, the Court referred to "the political franchise of voting" as "a fundamental political right, because preservative of all rights."*

> *The right of suffrage is denied by debasement or dilution of a citizen's vote in a state or federal election.*

> *Under the Equal Protection Clause, a claim of debasement of the right to vote through malapportionment presents a justiciable controversy, and the Equal Protection Clause provides manageable standards for lower courts to determine the constitutionality of a state legislative apportionment scheme.*

> *Our answer is this: a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us.*

> *To the extent that a citizen's right to vote is debased, he is that much less a citizen. The fact that an individual lives here or there is not a legitimate reason for overweighting or diluting the efficacy of his vote.*

> *A citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm. This is the clear and strong command of our Constitution's Equal Protection Clause.*

63. In *Wesberry v. Sanders*, Justice Black wrote for the Court that the district court dismissal order was wrong and the right to vote is too important to be stripped of judicial protection.

> *We agree with Judge Tuttle that, in debasing the weight of appellants' votes, the State has abridged the right to vote for members of Congress guaranteed them by the United States Constitution, that the District Court should have entered a declaratory judgment to that effect, and that it was therefore error to dismiss this suit. The question of what relief should be given we leave for further consideration and decision by the District Court in light of existing circumstances.*

*The right to vote <u>is too important in our free society to be stripped of judicial protection</u> by such an interpretation of Article I. This dismissal can no more be justified on the ground of "want of equity" than on the ground of "nonjusticiability." <u>We therefore hold that the District Court erred in dismissing the complaint</u>.*

64. Furthermore, when a serial-criminal finally stops committing any more crime, can he/she escape from being held accountable in the court of law? The answer must be NO. As Justice Douglas unequivocally affirmed in *Gray v. Sanders*:

*[T]he case is not moot … it would govern future elections if the complaint were dismissed… <u>[T]he voluntary abandonment of a practice does not relieve a court of adjudicating its legality</u>, particularly where the practice is deeply rooted and long standing; For if the case were dismissed as moot appellants would be "free to return to . . . [their] old ways*.

65. Since Defendant has so far shown no sign to voluntarily cease its discriminatory rules, the Court shall recall what Justice Kennedy declared in *Obergefell v. Hodges*, 576 U.S. 644 (2015):

*When the rights of persons are violated, the Constitution requires redress by the courts … and individual can invoke a right to constitutional protection when he or she is harmed.*

## G. Equal Opportunity to Participate is an Essential Part of Equal Voting Rights

66. The Framers clearly recognized there could be many ways to abridge citizens' voting rights, when they wrote the Equal Voting Right Clause in the Fourteenth Amendment to prohibit the right to vote at any election from being *abridged in any way*.

67. It is worth noting that Defendant quoted many previous court decisions in its motions, but never mentioned these four landmark decisions directly relevant to equal voting rights. In *Baker v. Carr*, *Gray v. Sanders*, *Reynolds v. Sims*, and *Wesberry v. Sanders*, the Supreme Court consistently declared an electoral system that imposed unequal treatment upon different voters in the same election simply because of where they live was unconstitutional.

68. As Chief Justice Warren wrote in *Reynolds v. Sims* that equal opportunity to participation by all voters must be guaranteed, and dilution of votes because of residence violates the Fourteenth Amendment.

*And the concept of equal protection has been traditionally viewed as <u>requiring the uniform treatment</u> of persons standing in the same relation to the governmental action questioned or challenged.*

*We conclude that the Equal Protection Clause <u>guarantees the opportunity for equal participation by all voters</u> in the election of state legislators.*

*<u>Diluting the weight of votes because of place of residence</u> impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race, Brown v. Board of Education, or economic status, Griffin v. Illinois, Douglas v. California.*

69. The present case concerns equal opportunity to participate in the presidential primary election process, which involves a sequence of elections. The states that go early have significant advantages, both voting power and economic benefits, over the states that go later. Hence it is essential to ensure that every state has the equal chance to go first or later in such process, so that the electoral process is fair and equitable for all voters in all states.

70. Voters in the Four States have always had the full opportunity to participate in the presidential primary process with most if not all of candidates on the ballot, and have far more chances to meet with candidates in person, asking questions and voicing concerns. In contrast, Appellant and voters in all Other States have had little or no opportunity at all to meet with any candidate, and by the time they went to the poll, there were fewer or even only one candidate remaining on the ballot. Appellant as well as voters in all Other States have been deprived of equal opportunity to participate in the presidential primaries because of Defendant's discriminatory rules. Appellant respectfully asks the Court to declare that deprivation of equal opportunity to

participate in the same electoral process is one form of "abridge", hence a violation of the Equal Voting Right Clause and Equal Protection Clause under the Fourteenth Amendment.

71. Voting Rights Act of 1965 Amended in 1982 Sec. 2 (b) outlaws *"voting procedures and methods of election which inhibit or dilute equal access to the electoral process".* Hence, Appellant respectfully asks the Court to recognize the existing presidential primaries system inhibit or dilute equal access to the electoral process.

72. Voting Rights Act of 1965 Amended in 1982 Section 2 finds a voting right violation if the totality of circumstances has "*shown that the political processes ... are not equally open to participation... that its members have less opportunity than other members of the electorate to participate in the political process*". Appellant respectfully asks the Court to recognize such violation in the presented case.

73. Both Article IV. § 2 and Amend. XIV. § 1 guarantee citizens of every state shall be treated equally. For decades Defendant's rules have discriminated against Appellant and voters in all Other States in the presidential primary process. Appellant respectfully asks the Court to recognize Defendant's existing rule has violated such constitutional principle.

74. Voting is the most sacred and peaceful form of political speech. Defendant's discriminatory rules have deprived Appellant of equal opportunity to participate in the presidential primary electoral process. The Court shall repudiate such violation of freedom of speech in Amend. I.

## H. Defendant's Discriminatory Rule Resembles Segregation

75. In essence Defendant's discriminatory rule has effectively segregated voters into two different classes in the presidential primary process based on state residence. This resembles the shameful history of segregation in the age of Jim Crow.

76. On December 1, 1955, Rosa Parks boarded a bus after work on her way home in Montgomery, Alabama. Ms. Parks sat at the back section designated for the people of color. When the bus driver ordered her to vacate her seat for other white passengers who just boarded the bus, Ms. Parks refused, then was arrested and penalized. In the era of Jim Crow Laws, buses in the South had two sections, the front section designated for a group of passengers, and the back section for another group of passengers. In *Browder v. Gayle, 142 F. Supp. 707* (1956) the District Court ruled that the enforced segregation on these privately-owned buses violated the Equal Protection Clause. The Supreme Court affirmed this decision, following its landmark ruling in *Brown v. Board of Education*, 347 U.S. 483 (1954) two years earlier.

77. In *Bush v. Gore*, 531 U.S. 98 (2000) the Supreme Court reaffirmed the constitutional principle that "equal weight" must be accorded to each vote, and "equal dignity" of each voter must be respected. In the present case, Appellant and voters in the Other States have been treated as second class citizen and denied "equal dignity."

78. Defendant represents a political party that (1) once attempted to preserve slavery through civil war and enacted Jim Crow Laws in the South, and its allies in the Supreme Court invented the so-called "Separate but Equal" doctrine in *Plessy v. Ferguson* 163 U.S. 537 (1896); then (2) since the 1960s, has become the champion for civil rights and voting rights for all Americans. However, in this case Defendant's conduct has brought back the darkest chapter of its own history. Defendant has a choice to make in this case, either going back to the shameful era of Jim Crow, or continuing the unfinished missions championed by JFK, MLK and LBJ.

79. Appellant grew up in one of those authoritarian regimes. Even though the right to vote is written in its constitution, ordinary citizens have no real opportunity to participate as the final outcomes are always predetermined. When Appellant went to the polling station on June 23,

2020, knowing that his vote had been rendered meaningless, and the final outcome had already been predetermined, Appellant couldn't help but wondered "is America the same as that authoritarian regime?"

### I. The Lessons from the *Dred Scott* Decision

80. While our founding fathers set forth awe-inspiring founding ideals, throughout our country's history, there have been more than a few court decisions that were made on legal technicality, procedural ground, prevailing doctrine or even constitutional textual provision at the time, nevertheless have been "*overruled in the court of history*" as Chief Justice Roberts formally apologized for the Korematsu decision.

81. In *Dred Scott v. Sandford*, 60 U.S. 393 (1856), the Supreme Court ruled against Mr. Scott because he was black, not a citizen, just a property of his slaveowner, therefore had no standing to sue at all. On paper, this decision was consistent with the Constitution of 1787 which counted "All Other Persons" as only three fifths, not even a whole person with human dignity. However, it is indisputable fact that (1) the Three-Fifth Clause and the Fugitive Clause were fundamentally wrong, and (2) legal pretense was used to justify and perpetuate injustice. It has been widely agreed that the *Dred Scott* decision is among the worst decisions in the court's history, not only repudiated in the court of conscience, but also reversed in the court of history by the Fourteenth Amendment and the Supreme Court's subsequent decisions.

82. Therefore, the lesson should be whenever there is injury-in-fact, Plaintiff/Appellant's standing to sue should not be denied by employing some legal tactic or pretense as what happened in *Dred Scott v. Sandford*. While Defendant's discriminatory rules brought back the memory of *Plessy v. Ferguson*, the District Court's ruling brought back the memory of *Dred Scott*. The

District Court should have followed the shining precedents of *Baker v. Carr, Reynoald v Sims, Wesberry v. Sanders,* and especially *Gray v. Sanders*, rather than *Dred Scott*.

**J. Is America Same as George Orwell's *Animal Farm*?**

83. In essence, under Defendant's discriminatory rules, Appellant and the majority voters in all the Other States have been deprived of equal opportunity to participate in the presidential primary election process, thus our votes have been devalued and debased or rendered meaningless.

84. In one of the greatest dissenting opinions, Justice John Marshall Harlan ardently reminded us,

*Our Constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law.*

Appellant believes Justice Harlan's principle of "color-blind" shall extend to residence-blind.

85. In *Gray v. Sanders*, writing for the Court Justice Douglas emphatically affirmed equal opportunity to participate in any election regardless of geographical residence:

*All who <u>participate</u> in the election are to have an <u>equal vote</u> — whatever their race, whatever their sex, whatever their occupation, whatever their income, and <u>wherever their home</u> may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment.*

86. Our country was founded in the fundamental principle that "***All men are created equal…with certain unalienable rights***" which was codified by the Equal Protection Clause and the Due Process Clause in the Fourteenth Amendment. However, Defendant's discriminatory rules and the District Court's order seemingly suggest America is the same as George Orwell's *Animal Farm* where "***All Americans are equal, but some Americans are more equal than others***".

87. An American by choice, Appellant sincerely hopes the Court will declare:

**"*America is NOT an Animal Farm.*"**

# VIII. Conclusion

88. Plaintiff-Appellant respectfully asks this Court to reverse the District Court's order and provide the following two reliefs:

- A declaratory judgment that every voter in every state shall have equal opportunity to participate in any election process, and his/her right to vote in any election shall not be denied, diluted, debased, diminished, demeaned, disadvantaged, or manipulated in any way by any means on any account including but not limited to geographical residence.

- An injunction that enjoins Defendant from continuing its existing discriminatory rules governing the presidential primary process that favors the Four States at the expense of all Other States.

Date: February 16, 2022

Respectfully Submitted,

Lewis Y. Liu

Plaintiff-Appellant *Pro Se*

## IX. Certification of Compliance

I, Lewis Y. Liu, certify that this appellant brief complies with FRAP 28, 28.1, 29, 32, and 32.1 and LRs 25.1, 31.1, and 32.1, as each rule may be applicable.

- has been reviewed by my attorney, Yuxi Liu Esq.

- contains 14,000 words or less.

- font type and size used: Times New Roman 12.

- space is set at 2.

- all margins (top & bottom, left & right) are 1 inch.

